Louise SAWYER, Plaintiff,

v.

SOUTHWEST AIRLINES CO., Defendant.

Grace Fuller, Plaintiff,

v.

Southwest Airlines Co., Defendant.

No. CIV.A. 01–2385–KHV.

United States District Court,
D. Kansas.

Feb. 5, 2003.

As Amended March 18, 2003.

1260

Todd W. Amrein, Phoenix, AZ, John W. Cowden Baker, Sterchi, Cowden & Rice, L.L.C., Kansas City, MO, Mary C. O'Connell, Baker, Sterchi, Cowden & Rice, L.L.C., Kansas City, MO, for Southwest Airlines Co.

Elizabeth Drill Nay, Lewis, Rice & Fingersh, L.C., Kansas City, MO, Scott A. Wissel Lewis, Rice & Fingersh, L.C., Kansas City, MO for Louise Sawyer.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Louise Sawyer and Grace Fuller bring suit against Southwest Airlines Co. ("Southwest"), alleging that it violated their rights under 42 U.S.C. § 1981 and intentionally inflicted emotional distress under Kansas law. Fuller also alleges that Southwest negligently inflicted emotional distress. The matter is before the Court on *Defendant Southwest Airlines Co.'s Motion To Exclude The Testimony Of Plaintiffs' Expert Valdenia Winn* (Doc. # 78) filed November 15, 2002 and *Defendant Southwest Airlines Co.'s Motion For Summary Judgment* (Doc. # 79) filed November 15, 2002. For reasons stated below, the Court sustains each motion in part.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okla.,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on her pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing summary judgment. *See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## Factual Background

The following facts are either undisputed or, where disputed, construed in the light most favorable to plaintiffs.

### I. Plaintiffs' Experience With Southwest

Plaintiffs are African–American. On February 12, 2001, plaintiffs—who are sisters—flew from Kansas City, Missouri to Las Vegas, Nevada on Southwest Airlines. Their return flight, number 2441, was scheduled to leave Las Vegas at 9:30 a.m. on February 15, 2001.

### A. Flight 2441

On February 15, 2001, plaintiffs arrived at the Las Vegas airport around 8:30 a.m. They waited in the Southwest check-in line for about 45 minutes and arrived at the departure gate at 9:22 a.m. Southwest customer service agent Laura Gonzalez, who was at the gate, refused to let plaintiffs board because their check-in time was less than ten minutes before the scheduled departure and they were subject to Southwest's ten minute rule.[1] Plaintiffs did not know about the ten minute rule, so Gonzalez showed Fuller that it was printed on her ticket.[2] Although Gonzalez was stern, she and plaintiffs had a civil conversation.[3]

---

**1.** Southwest has a contract of carriage through the Airline Transportation Association. Through the contract of carriage the Airline Transportation Association specifies rules that airlines are obligated to uphold. *Karen Yowell Deposition* 21:9–14, Exhibit C in *Defendant Southwest Airlines Co.'s Memorandum In Support Of Motion For Summary Judgment ("Defendant's Memorandum")* (Doc. # 81) filed November 15, 2002. One of those rules is a ten minute rule that all customers with reservations for travel must check in at least ten minutes before departure. If a passenger does not exchange his or her reservation for a boarding pass ten minutes before a scheduled departure (thereby confirming a seat on the flight), the reservation is subject to cancellation and Southwest will accommodate standby customers. The rule allows customers to present themselves

at the boarding gate up to ten minutes before the scheduled departure and gives Southwest an opportunity to board standby customers on the assumption that the confirmed customer is not going to show up.

**2.** The ticket stated: "TEN—MINUTE RULE—Passengers who do not claim their reservations at the departure gate desk at least ten minutes prior to scheduled departure time will have their reserved space cancelled and will not be eligible for denied boarding compensation." *Southwest Airlines Ticketless Travel Passenger Itinerary And Receipt* Exhibit F in *Defendant's Memorandum* (Doc. # 81).

**3.** While Fuller believes that Gonzalez discriminated against her on the basis of race, she has no evidence that Southwest did not equally apply the ten minute rule to all passengers.

Because Flight 2441 was full and plaintiffs had checked in late, Gonzalez placed them on the "priority standby" list at no additional cost, for the next available Southwest flight to Kansas City. That flight, Flight 524, was scheduled to leave at 12:00 p.m. Fuller was irritated that she was not allowed to board Flight 2441, but she did not experience any stress which resulted in physical symptoms. According to Sawyer, Fuller was "a little tee'd off, upset and irritated," and Sawyer herself was irritated. Plaintiffs, however, do not believe or claim that they should have been exempted from the ten minute rule.

Gonzalez has been a customer service agent for Southwest since October of 1996, working at the ticket counter and boarding gate. She testified that she applies the ten minute rule equally to all passengers, that she does not discriminate on the basis of race or national origin, and that she has never prohibited a passenger from boarding based on race or national origin. Plaintiffs have cited no contrary evidence.

### B. Flight 524

After it boarded all non-standby passengers on Flight 524, Southwest allowed plaintiffs to board. When plaintiffs first boarded, they could not find open seats. As plaintiffs stood in the aisle, searching for seats, Southwest flight attendant Jennifer Cundiff said over the intercom, "eenie, meenie, minie, moe, pick a seat, we gotta go." Plaintiffs recognized the comment as a reference to a racist nursery rhyme which began: "eenie, meenie, minie,

moe; catch a nigger by his toe ..." Plaintiffs were the only passengers standing in the aisle and in response to Cundiff's comment, many passengers snickered and directed their attention to plaintiffs. After the comment, Sawyer sat down in a seat near the front of the airplane. Because no other seats were open, Fuller remained standing until another Southwest employee instructed a different flight attendant, who was an unticketed passenger on the flight, to give up her seat for Fuller.

Defendant's conduct humiliated, angered and alienated plaintiffs. Fuller did not feel that she had received the same treatment as other passengers on the flight. Plaintiffs worried that the comment would cause Fuller to have a seizure on the plane. After Cundiff's comment, a male flight attendant gave Fuller special attention by offering her drinks and peanuts and trying to make her comfortable. As Fuller sat on the airplane, she became more angry and embarrassed at the way she was treated. During the flight, her hands were shaking. She took epilepsy medication and tried to calm down. When the airplane landed, Fuller's hands were still shaking. Fuller has significant and unexplained memory gaps about Flight 524 and her drive home from the airport.[4] Fuller rested when she got home because she was drained and upset. Fuller had a grand mal seizure on the evening of February 15, 2001 and was bedridden for three days, but she was uninsured and she therefore did not seek medical attention.[5]

---

*Fuller Deposition* at 46, Exhibit 2 in *Plaintiffs' Response To Defendant's Motion For Summary Judgment* *("Plaintiffs' Response")* (Doc. # 87) filed December 30, 2002. Gonzalez does not remember any unusual events on February 15, 2001 which involved plaintiffs or the ten minute rule.

**4.** Fuller does not know whether she had a petit mal seizure on the flight. She does not

remember whether she talked to other passengers or slept during the flight. During and immediately after the flight she was very upset at what had happened.

**5.** Fuller testified that she does not always seek medical treatment after a seizure because she does not receive specific treatment for seizures and, after the fact, a doctor cannot do anything about a seizure.

After February 15, plaintiffs wrote letters of complaint to Southwest. Southwest instigated an investigation and asked Cundiff to write a report. In her report, Cundiff wrote "the statement I made on Flight 524 was not racist or discriminating, and I am offended that because I have white skin suddenly I am a racist. Maybe those that run around pointing fingers yelling racist should stop and turn that finger around." *Cundiff Deposition,* Exhibit 6 in *Plaintiffs' Response To Defendant's Motion For Summary Judgment* (Doc. # 87) filed December 30, 2002. Southwest did not believe the phrase was racist and did not reprimand Cundiff for using it or instruct her to stop using it. Cundiff no longer uses it, however, because of the ordeal it has put her and Southwest through.

## II. Southwest Flight Attendants

Southwest flight attendants are responsible for the safety and enjoyment of passengers on the aircraft, and Southwest is known for using humorous announcements over the intercom.[6]

Flight attendants attend four weeks of initial training. The training includes a video called "It's a Matter of Respect," by Herb Keller. It and the Southwest flight attendant manual cover racial sensitivity. Flight attendants are required to attend recurrent training at least once every 13 months. Recurrent training, which lasts one day, keys in on the most essential information like how to evacuate the aircraft, CPR and rescue breathing, and security. Southwest also uses "read before flies," memoranda which are posted in a briefing book at every base to communicate with flight attendants. Flight attendants are required to read the information before they fly. These memoranda are used to get information to flight attendants on short notice. *Paula Gaudet Deposition* at 11–12, Exhibit 5 in *Plaintiffs' Response* (Doc. # 87). Training programs and "read before flies" do not discuss comments, words or phrases that flight attendants should or should not use over the aircraft intercom. *Id.* at 7–10.

## III. Jennifer Cundiff

Cundiff has worked as a Southwest flight attendant since 2000. On several prior flights, Cundiff had said "eenie meenie, minie, moe, pick a seat, we gotta go" over the intercom to get passengers to sit down and inject humor on board the aircraft. She first heard the phrase from other flight attendants. *Cundiff Deposition* at 9–10. Cundiff used it only when the aircraft was completely full and running late and passengers were in the aisle.[7] When Cundiff made the remark on Flight 524, Southwest was running about ten minutes late, passengers had been on the plane for "quite a while," and some people were getting up and standing in the aisle.[8] Cundiff testified that she directed the remark to all passengers, that she did not believe it was racist, and that she did not intend to be discriminatory or racist. She intended only to make the flight enjoyable.

Cundiff, who was born on April 11, 1978 and grew up in Argyle, Texas, was 22 years old on February 15, 2001. When she was growing up, she never heard the word "nigger" or the phrase "eenie, minie, minie, moe, catch a nigger by the toe."

**6.** Southwest encourages but does not require flight attendants to use humor on airplanes. *Cundiff Deposition* 11:14.

**7.** When a flight is delayed, seated passengers get up to retrieve books and magazines from their bags, making it difficult for those who are still boarding to find seats and for flight attendants to prepare for departure.

**8.** Cundiff claims that eight to 12 people were standing in the aisle, but plaintiffs have testified that they were the only passengers in the aisle when Cundiff made the remark.

She had heard the nursery rhyme, "eenie, meenie, minie, moe, catch a tiger by its toe. If he hollers, let him go, my mother told me ..." and "eenie, meenie, minie, moe, here comes a piggy to grab your toe."

## IV. Grace Fuller

Since October 5, 1998, Ivan Osorio, M.D., has treated Fuller for seizures which probably result from epilepsy. According to Dr. Osorio, Fuller can suffer a seizure virtually any time, any place, without any apparent cause other than the fact that she may suffer from epilepsy. Before February 15, 2001, Fuller had seizures and complained to Dr. Osorio about shaking hands.[9] According to Fuller, stress is a trigger for her seizures. Dr. Osorio could not pinpoint any particular seizure that Fuller had suffered on account of stressful activity, however, and he testified that shaking hands may be a side effect of her medication.

Fuller did not seek professional counseling after the events of February 15, 2001, but she called Dr. Osorio's office on February 21 about her grand mal seizure on February 15. During the call, Fuller told Dr. Osorio's nurse that she had a loss of appetite and difficulty sleeping, but that

she did not have insurance at the time and could not seek medical care.

Dr. Osorio cannot express an opinion about the cause of the symptoms that Fuller experienced on February 15, 2001.

## V. Louise Sawyer

Sawyer did not become physically ill or seek treatment from a psychologist or psychiatrist as a result of the events on February 15, 2001. She did not miss work and except for the fact that a lawsuit is on file, her life has not been altered in any way.

## VI. Claims

Southwest seeks summary judgment on all claims. As to plaintiffs' discrimination claim under 42 U.S.C. § 1981, Southwest argues that as a matter of law, plaintiffs cannot prove (1) intentional discrimination on the basis of race or (2) discrimination which concerns activities enumerated in Section 1981. On plaintiffs' claim for intentional infliction of emotional distress, Southwest maintains that plaintiffs cannot prove that it intentionally and recklessly subjected them to extreme and outrageous conduct which caused extreme mental distress. On Fuller's claim for negligent infliction of emotional distress, Southwest

---

**9.** Dr. Osorio testified that a petit mal seizure is characterized by lack of awareness on the part of the patient, and a grand mal seizure or convulsion is characterized by unconsciousness, loss of postular tone (the patient drops to the ground) and abnormal movements. *Dr. Osorio Deposition* at 10.

The frequency of Fuller's seizures has varied. Fuller first saw Dr. Osorio on October 5, 1998, when she complained of seizures for six to seven years. *Id.* at 7. When Dr. Osorio saw Fuller five months later, on March 3, 1999, she reported having two seizures between visits. The following month, on April 19, 1999, Fuller reported no seizures. On July 19, 1999 she reported one seizure in a three-month span. Six months later, on January 12, 2000 Fuller reported no seizures. Two months later, on March 22, 2000, she reported numer-

ous petit mal seizures and two convulsions. On May 5, 2000 Fuller reported two petit mal seizures and one grand mal seizure in two months. Three months later, on August 2, 2000, Fuller reported more petit mal seizures and three to four grand mal seizures. Two months later, on October 2, 2000, she reported two to three petit mal seizures per week and said that she found herself on the floor every other week. On January 3, 2001 Fuller reported the same frequency of both petit mal seizures and convulsions. Six months later, on June 11, 2001, Fuller reported two to three petit mal seizures and two grand mal seizures per week. On August 28, 2002 she reported one petit mal seizure a week and convulsions maybe once a month since March of 2002. *Id.* at 8–17.

argues that plaintiff cannot prove negligence or contemporaneous physical injury as a direct result of its conduct.

Under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny, Southwest also seeks to preclude testimony by plaintiffs' expert, Dr. Valdenia Winn, who proposes to testify about racism and segregation in the United States from the 1850s to the present, the history of the "eenie, meenie, minie, moe" nursery rhyme, and whether the phrase is outrageous and objectively racist.

### *Analysis*

### I. Motion To Exclude Testimony By Dr. Winn

#### A. Standards For Admitting Expert Testimony

■ The touchstone of Rule 702, Fed. R.Evid., is helpfulness of the expert testimony—a condition that goes primarily to relevance. *See BioCore, Inc. v. Khosrowshahi,* 183 F.R.D. 695, 699 (D.Kan. 1998) (quoting *Miller v. Heaven,* 922 F.Supp. 495, 501 (D.Kan.1996)). Thus, the Court must determine whether the proffered evidence would be helpful to the trier of fact. *See BioCore,* 183 F.R.D. at 699. In so doing, the Court examines specific subject areas of proposed expert testimony to ascertain whether each is sufficiently tied to the facts of the case so that it will be helpful to the fact finder. *See id.* Any doubts should be resolved in favor of admissibility. *See id.*

■ The Court has broad discretion in deciding whether to admit expert testimony. *See Kieffer v. Weston Land, Inc.,* 90 F.3d 1496, 1499 (10th Cir.1996). Rule 702 allows expert testimony, by opinion or otherwise, if the witness who is qualified as an expert by knowledge, skill, experience, training or education, and her specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony is admissible only if it is both relevant and reliable. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (citing *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). The trial judge has a general "gate-keeping" obligation which "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Id.* at 142, 119 S.Ct. 1167. Reliability determinations must be tied to the facts of the particular case. *Id.* at 150, 119 S.Ct. 1167. The *Daubert* test of reliability is flexible and the court may use the *Daubert* factors: (1) whether the proffered technique can and has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a technique in the relevant community. *See id.* at 149, 119 S.Ct. 1167. "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142, 119 S.Ct. 1167 (citations omitted).

■ An expert's qualifications are relevant to the reliability inquiry. *See United States v. Taylor,* 154 F.3d 675, 683 (7th Cir.1998); *In re Indep. Serv. Org. Antitrust Litig.,* 85 F.Supp.2d 1130, 1163 (D.Kan.2000).

#### B. Dr. Valdenia Winn

■ Plaintiffs offer Dr. Winn's testimony to provide non-scientific factual and opinion testimony to educate the jury about the historical genesis of "eenie, meenie, minie, moe" and to explain why the phrase is inherently offensive and racist. Dr. Winn, who holds a Doctorate of Philosophy, has been a college professor of histo-

ry, political science, American foreign policy and labor studies from 1972 to the present. She has engaged in extensive lecturing, teaching, reading and study in the areas of Black History and racial and ethnic stereotypes in American society. She proposes to testify that:

(1) The phrase "eenie, meenie, minie, moe ..." is the first line to a racist nursery rhyme that incorporates the word "nigger."

(2) There are many derivations of the racist nursery rhyme, but almost all versions begin with "Eenie meenie minie moe / Catch a nigger by the toe ...."

(3) The "eenie, meenie, minie, moe" nursery rhyme was common in pre-Civil War America when slavery was legal, and blacks were considered property and less than human.

(4) The use of the word "nigger" in the nursery rhyme and the imagery of a "nigger" being something a white person could "catch" had the intended effect of dehumanizing blacks, and teaching white children that blacks were inferior.

(5) During this same time period, "white" society used racist caricatures and other racist words and phrases to achieve this same racist goal. These racist caricatures, phrases, and words imparted the accepted public policy that whites were superior to blacks, and that blacks were effectively not human.

(6) Such racists words, phrases, and caricatures continued to permeate society and was reflected in popular culture in America after the Civil War.

(7) "White" society continued to use the "eenie, meenie, minie, moe" nursery rhyme after the Civil War and throughout the Jim Crow era.

(8) During the Jim Crow era and throughout the 1960's the "eenie, meenie, minie, moe" nursery rhyme and other racist words, phrases, and caricatures were used to depict blacks as inferior to whites, to dehumanize blacks, and to teach racism and separatism to white children.

(9) Because of the history surrounding the purpose and effect of the "eenie, meenie, minie, moe" nursery rhyme, the phrase "eenie, meenie, minie, moe" is outrageous, objectively racist, insulting to African Americans, and has no place in society.

(10) In the year 2002, virtually all adult African Americans would understand the phrase "eenie, meenie, minie, moe" to be the opening line to the racist nursery rhyme containing the word "nigger," and would consider the utterance of the phrase to be racist, reprehensible, and outrageous.

(11) African Americans born prior to 1960 would be particularly sensitive to and outraged by the racist message and purpose of the phrase "eenie, meenie, minie, moe."

(12) The "eenie, meenie, minie, moe" nursery rhyme is still in use today, but the work "nigger" is generally removed and replaced with the word "tiger."

(13) The substitution of the word "tiger" for "nigger" highlights the original purpose and meaning of the "eenie, meenie, minie, moe" nursery rhyme. The nursery rhyme imparted to the listener that "niggers," like tigers, were dangerous animals that should be feared and destroyed.

*Report of Dr. Valdenia Winn, Ph.D.* at 1–2, Exhibit 1 in *Plaintiff's Response to Defendant's Motion to Exclude Expert Testimony And Request for Hearing* (Doc. # 84) filed December 18, 2002.

Southwest argues that Dr. Winn's testimony should be excluded because her opinions and methodology do not satisfy the requisite criteria for relevancy and reliability. Specifically, Southwest argues that (1) her opinions are not relevant; (2) her testimony contains improper legal conclusions; (3) her testimony is within the common knowledge of the jury; and (4) her testimony is not reliable. Plaintiffs respond that Dr. Winn's testimony should be admitted because (1) it is based upon extensive, specialized experience as an educator, lecturer and student of American history, Black history, race relations and racial and ethnic stereotypes in American society; and (2) it will provide the jury the specialized knowledge which it needs to decide the factual issues before it.

■■■ "Reliability analysis applies to all aspects of the expert's testimony, including the facts underlying the opinion, the methodology and the link between the facts and the conclusion drawn." *Fuentes v. Thomas,* 2000 WL 1114892, at *2 (D.Kan. July 13, 2000) (citations omitted). The Court must therefore make a practical, flexible analysis of the reliability of the testimony considering relevant factors and the circumstances of the case. *See Fuentes,* 2000 WL 1114892, at *2.

The Court agrees that because the parties dispute how "eenie, meenie, minie, moe" is reasonably interpreted in the year 2001, most of Dr. Winn's testimony is relevant. Even Southwest is apparently of two minds on the question, variously arguing that (1) it is "common knowledge" that "eenie, meenie, minie, moe" is the first line of a racist nursery rhyme that originally ended "catch a nigger by the toe," and (2) that the phrase is totally benign and could not reasonably be interpreted as a racial slur. Dr. Winn's testimony on this issue is not an opinion or legal conclusion, and the Court has no reason to question its reliability. The genesis of the phrase is essen-

tial to an understanding of the parties' dispute, and nothing in the record suggests that such information is a matter of common knowledge. The Court therefore finds that the subjects outlined in paragraphs 1, 2, 3, 4, 7, 8 (except as to "other racist words, phrases, and caricatures") and 12 are helpful, relevant and generally admissible.

Several of the matters outlined in Dr. Winn's report are irrelevant and therefore inadmissible. In particular, paragraphs 5, 6, 8 (in part) and 13 concern racist language and caricatures which are not at issue in this case. Testimony on these subjects will not help the jury understand the evidence or determine a factual issue before it. In addition, the probable value of such evidence would be substantially outweighed by the considerations of undue delay and waste of trial time. Rule 403, Fed.R.Evid. The matters outlined in paragraphs 5, 6, part of 8 and 13 are therefore not admissible.

■■■ Paragraphs 9 and the last part of paragraph 10 opine that African Americans would consider the phrase to be racist, reprehensible, and outrageous. Dr. Winn's opinion on this question is essentially a legal conclusion. Expert testimony may not include improper legal conclusions, and "in no instance can a witness be permitted to define the law of the case." *Smith v. Ingersoll–Rand Co.,* 214 F.3d 1235, 1246 (10th Cir.2000) (citations omitted). While an expert may be "called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms," expert testimony which "attempts to define the legal parameters within which the jury must exercise its fact-finding function" is impermissible. *Id.* The Advisory Committee notes to Rule 704, Red. R. Evid., make it clear that opinions which merely give legal conclusions or allow the witness to tell the jury what result to reach are not

permitted. *See* Fed.R.Evid.; *Owen v. Kerr–McGee Corp.*, 698 F.2d 236, 239–40 (5th Cir.1983) (citations omitted). Paragraph 9 and the last part of paragraph 10 are also inadmissible because they would not be helpful to the jury's deliberations. Any jury would be well qualified to evaluate whether Cundiff's comment was outrageous and offensive in the context of this case. Dr. Winn's opinions on this issue are irrelevant.

■ Dr. Winn also proposes to testify about the sensitivities of African Americans born before 1960. She has apparently done no studies, polling or tests, however, which form the basis for her opinion, and the record does not establish that she is otherwise qualified to express this opinion. The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation." *Mitchell v. Gencorp. Inc.*, 165 F.3d 778, 780 (10th Cir.1999). The question is one of reliability. Absent proof of study, polling or testing, Dr. Winn's testimony appears to be speculative and a mere expression of personal views and perceptions. Paragraph 11 is therefore inadmissible.

In sum, the Court overrules Southwest's motion in limine as to paragraphs 1, 2, 3, 4, 7, 8 (except as to "other racist words, phrases, and caricatures") and 12 of Dr. Winn's report. The motion is otherwise sustained.

## II. Defendant's Summary Judgment Motion

### A. Discrimination In Violation Of 42 U.S.C. § 1981

Plaintiffs allege that Southwest discriminated against them in violation of 42 U.S.C. § 1981 when Gonzalez did not board them on Flight 2441 and Cundiff remarked "eenie, meenie, minie, moe, pick a seat, we gotta go" over the intercom on Flight 524. Specifically, plaintiffs claim that Southwest's conduct made the terms and conditions of their respective contracts with Southwest less favorable than the terms and conditions which white customers of Southwest enjoyed. *Pretrial Order* (Doc. # 77) at 9. Section 1981 provides:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contract" includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

■ The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981. To establish a prima facie case of discrimination under Section 1981, plaintiffs must prove (1) that they are members of a protected class; (2) that Southwest intended to discriminate against them on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in Section 1981. *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1102 (10th Cir.2001).[10] South-

---

**10.** In the retail setting, courts have modified the traditional prima facie test, which is de-

west contends that it is entitled to summary judgment because plaintiffs cannot make out a prima facie case. Specifically, Southwest argues that plaintiffs cannot show (1) that Southwest intended to discriminate when Gonzalez prohibited them from boarding Flight 2441 or when Cundiff her remark on Flight 541, or (2) that the alleged discrimination concerns one or more activities enumerated in Section 1981.

### 1. Intent

■ While the prima facie elements "are flexible and not to be applied rigidly," *Hampton*, 247 F.3d at 1102 (quotations omitted), to establish a claim under Section 1981, plaintiffs must show that Southwest intentionally or purposefully discriminated against them. *See Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1532 (10th Cir.1995). In this regard, "the proper focus is on whether the defendant had the intent to discriminate on the basis of race, and whether that discrimination interfered with the making or enforcing of a

signed for employment contract cases. *See Hampton*, 247 F.3d at 1102; *Callwood v. Dave & Buster's, Inc.*, 98 F.Supp.2d 694, 703 (D.Md.2000). Plaintiffs argue that the prima facie test articulated in *Hampton* is "unworkable" in this case and urge the Court to apply the modified prima facie test which the District of Maryland adopted in *Callwood. Plaintiffs' Response* (Doc. # 87) at 26–27. The *Callwood* court held that to establish a prima facie case, plaintiffs must prove:

(1) that plaintiffs are members of a protected class;
(2) that plaintiffs made themselves available to receive and pay for services which defendant ordinarily provided to all members of the public in the manner in which defendant ordinarily provided such services; and
(3) that plaintiffs did not enjoy the privileges and benefits of the contracted-for experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) defendant deprived them of services while it did

contract." *Hampton*, 247 F.3d at 1106–07 (Section 1981 protects from *any* impairment of the enjoyment of benefits of contract, so long as impairment arises from intentional discrimination).

### a. Flight 2441

■ The undisputed evidence is that Southwest refused to let plaintiffs board Flight 2441 because they reached the departure gate eight minutes before the scheduled departure and they were subject to Southwest's ten minute rule—which was clearly stated on their tickets. Gonzalez placed plaintiffs on the priority standby list for the next available flight to Kansas City, which was scheduled to leave two and one-half hours later.

The ten minute rule is facially neutral and plaintiffs cite no evidence that Southwest applies it in a racially disparate manner or that Gonzalez intended to discriminate on the basis of race. Plaintiffs do not claim that they should have been exempted from the ten minute rule. Plaintiffs' only

not deprive similarly situated persons outside the protected class of those services, and/or (b) plaintiffs received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.

*See Callwood*, 98 F.Supp.2d at 707. Plaintiffs argue that this test is more germane because it allows the Court to infer discriminatory intent rather than requiring plaintiffs to prove the requisite intent, and it encompasses a deprivation of services which impinge on the "benefits, privileges, terms, and conditions of the contractual relationship protected by section 1981(b)." *Plaintiffs' Response* (Doc. # 87) at 26–27 (citing *Callwood*, 98 F.Supp.2d at 707).

As applied to this case, the prima facie tests of *Hampton* and *Callwood* do not appear to be materially different except in wording. Both tests require proof of intentional discrimination, which may be direct or circumstantial. The Court is bound by the Tenth Circuit precedent and therefore applies *Hampton*.

evidence of discrimination is that Gonzalez was stern—which does not create a genuine issue of material fact whether Southwest intended to discriminate in refusing to let plaintiffs board Flight 2441.[11] Therefore, assuming that refusal to board plaintiffs could violate Section 1981 in other circumstances, defendant is entitled to summary judgment on this claim.

### b. Flight 524

■ With regard to Cundiff's "eenie, meenie, minie, moe" remark, Southwest argues that it is entitled summary judgment because Cundiff's remark was not a racial slur, because plaintiffs cannot prove intentional discrimination, and because Southwest did not prevent plaintiffs from making or enforcing a contract in violation of Section 1981.

While plaintiffs cite no direct evidence that Cundiff intended a racial slur, plaintiffs who lack direct evidence of racial discrimination may rely on indirect evidence of discrimination. *Hampton,* 247 F.3d at 1107. Plaintiffs argue that because of its history, "eenie, meenie, minie, moe" is an objectively racist and offensive phrase, regardless of the context in which it is used. Plaintiffs also argue that the following facts give rise to a reasonable inference that Cundiff intended to discriminate by using that phrase: (1) plaintiffs were the only passengers who were not seated when Cundiff made the remark; (2) white passengers laughed at Cundiff's comment and directed their attention to plaintiffs; (3) a male flight attendant later patronized Fuller by offering drinks and peanuts and trying to make her feel comfortable; (4) Cundiff's testimony that she never heard the word "nigger" when she was growing up is inherently incredible; and (5) Cundiff later wrote that "the statement I made on

the Fl. # 524 was not racist or discriminating—and *I* am offended that [because] I have white skin, suddenly I'm racist? Maybe those that run around pointing fingers, yelling 'racists!' should stop & turn that finger around." *Plaintiffs' Response* (Doc. # 87) at 39.

The Court agrees with plaintiffs that because of its history, the phrase "eenie meenie, minie, moe" could reasonably be viewed as objectively racist and offensive. The jury, however, must decide whether Cundiff's remark was racist, or simply a benign and innocent attempt at humor. The record contains evidence that when Cundiff made the remark, plaintiffs were the only passengers standing in the aisle and thus the only possible targets of her attention. This circumstance raises a genuine issue of material fact regarding Cundiff's credibility in denying discriminatory intent. On this record, a jury could find that the phrase is objectively offensive to African Americans, or at least those African Americans who are familiar with its history. The next question is whether Cundiff's remark is otherwise actionable under Section 1981.

### 2. Protected Activity Under Section 1981

■ As noted, plaintiffs were not denied admittance or service on Flight 524. Southwest boarded plaintiffs, transported them to Kansas City, and apparently gave them the same refreshments, access to toilet facilities and other amenities as white passengers. Plaintiffs claim, however, that because of Cundiff's remark, they did not enjoy the benefits and privileges of contract which white passengers enjoyed. Specifically, plaintiffs argue that "an African American passenger who is subjected

---

11. In fact, Sawyer testified that but for Cundiff's comment on Flight 524, she would not have considered herself to be the subject of racial discrimination. *Sawyer Deposition* 54:21–25 and 55:1.

to racial slurs and epithets by a flight attendant does not enjoy the same privileges and benefits of the contract with Southwest as those enjoyed by white passengers." *Plaintiffs' Response* (Doc. # 87) at 32. Southwest seeks summary judgment that as a matter of law, Section 1981 did not entitle plaintiffs to freedom from racial comments during the flight.

On its face, Section 1981 addresses "any act of discrimination committed in the making or the performance of a contract." In *Hampton*, the Tenth Circuit made it clear that Section 1981 requires "interference with a contract beyond the mere expectation of being treated without discrimination." *Hampton*, 247 F.3d at 1118; *see, e.g., Lewis v. J.C. Penney Co., Inc.*, 948 F.Supp. 367, 371 (D.Del.1996) (rejecting theory that unwritten contract between commercial establishment and public guarantees members equal treatment regardless of race); *Robertson v. Burger King, Inc.*, 848 F.Supp. 78, 81 (D.La.1994) (dismissing claim where plaintiff not denied admittance or service). At the same time, Section 1981 explicitly reaches contract "performance" and its legislative history reveals that Congress viewed Section 1981 as a critically important tool in striking down racially discriminatory practices in a broad variety of contexts. In *Callwood v. Dave & Buster's, Inc.*, 98 F.Supp.2d 694 (D.Md.2000), the district court summarized that legislative history as follows:

> Congress intended the amended language in section 1981–in particular, the use of the phrase "benefits, privileges, terms and conditions"-to be an "illustrative rather than exhaustive" list of the protected facets of the contractual relationship.
>
> The illustrative language was "intended to bar all race discrimination in contractual relations...." [T]he use, in section 703 of Title VII of the Civil Rights Act of 1964, of the phrase "benefits, privileges, terms and conditions of the con-

tractual relationship" "evinces a congressional intent to strike at the entire spectrum of disparate treatment."

98 F.Supp.2d at 703 (citations omitted). In *Callwood*, the district court noted that "the trivialities and frustrations of life in post-modern America must not be made the fodder for federal civil rights claims simply because service is slow or otherwise lacking in those attributes paying customers always have a right to expect." *Id.* at 706 (citations omitted). At the same time, it noted that Section 1981 has been increasingly employed in a restaurant setting, as follows:

> In the restaurant context, section 1981 has been read to protect against the discriminatory denial of the accouterments that are ordinarily provided with a restaurant meal.... Put another way, the contract formed between a restaurant and a customer does include more than just the food served, in that the experience includes being served in an atmosphere which a reasonable person would expect in the chosen place.

*Id.* at 703 (citations and quotations omitted). In *Callwood*, defendant argued that Section 1981 did not implicate "poor service," but only a denial of "all service *per se*," and that it was therefore entitled to summary judgment. *Id.* at 715. The district court summarily rejected this argument, holding that

> [w]hen ... allegations go beyond poor service, and the inference of discriminatory intent has been successfully raised, ... what would initially be seen as a regrettable and frustrating phenomenon familiar to all who eat at restaurants, becomes conduct which necessarily implicates section 1981's protection of the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

*Id.* (citations and quotations omitted). In so holding, the district court in *Callwood* incorporated its prior ruling that "markedly hostile" behavior towards members of the protected class may give rise to a rational inference of discrimination, and that factors relevant to the determination whether defendant's conduct is "markedly hostile" include whether the merchant's conduct is "(1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination." *Id.* at 708; *see, e.g., McCaleb v. Pizza Hut of Am.*, 28 F.Supp.2d 1043, 1048 (N.D.Ill.1998) (Section 1981 cause of action exists where defendant denied plaintiffs opportunity to purchase and provided plaintiffs less than what they paid for); *Perry v. Burger King Corp.*, 924 F.Supp. 548, 551–52 (S.D.N.Y. 1996) (denial of full services for which plaintiff paid).

Viewing the evidence in the light most favorable to plaintiffs, Cundiff's comment did more than violate plaintiffs' "mere expectation of being treated without discrimination." Flight attendants for Southwest are responsible for passenger safety and "enjoyment," and a jury might reasonably conclude that plaintiffs' contract with Southwest incorporated a right to transportation and service in an atmosphere which did not make plaintiffs the butt of a racist joke over the aircraft intercom. Viewed in this light, and ignoring all inferences to the contrary, Cundiff's remark went beyond poor service; it evidenced marked hostility to plaintiffs which was contrary to the business interests of Southwest, far outside of widely accepted business norms and arbitrary on its face. The record therefore reveals genuine issues of material fact whether Southwest deprived plaintiffs of "the enjoyment of all benefits, privileges, terms and conditions"

expected to be enjoyed and actually enjoyed by ones not in a protected class who flew on Southwest Flight 524 on February 15, 2001. Summary judgment is therefore not appropriate on this claim.

### B. Intentional Infliction Of Emotional Distress

Kansas recognizes the tort of intentional infliction of emotional distress. *Moore v. State Bank of Burden*, 240 Kan. 382, 388, 729 P.2d 1205 (1986). Liability arises when a person engages in extreme and outrageous conduct and thereby intentionally or recklessly causes severe emotional distress to plaintiffs. *Id.*

Plaintiffs allege that Southwest's conduct was extreme and outrageous and amounted to intentional infliction of emotional distress. *Pretrial Order* (Doc. # 77) at 9. To prevail on a claim for intentional infliction of emotional distress, plaintiffs must prove that (1) the conduct of Southwest was intentional or in reckless disregard of plaintiffs; (2) the conduct was extreme and outrageous; (3) a causal connection existed between Southwest's conduct and plaintiffs' mental distress; and (4) plaintiffs' mental distress was extreme and severe. *Id.* (citing *Hoard v. Shawnee Mission Med. Ctr.*, 233 Kan. 267, Syl. ¶ 3, 662 P.2d 1214 (1983)). Southwest argues that it is entitled summary judgment because its conduct was not "extreme and outrageous" and, even if it was, plaintiffs did not suffer emotional distress which was so severe that no reasonable person should be expected to endure it.

In evaluating Southwest's argument, the Court must first ascertain whether its conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *See Roberts v. Saylor*, 230 Kan. 289, 292, 637 P.2d 1175, 1179 (1981). To be regarded as "extreme and

outrageous," defendant's conduct must satisfy the following test:

> Liability may be found only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.... [F]urther ... liability may be found to exist generally in a case when the recitation of facts to an average citizen would arouse resentment against the actor, and lead that citizen to spontaneously exclaim, "Outrageous!" It should be understood that liability does not arise from mere insults, indignities, threats, annoyances, petty expression, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind. The law should not intervene where someone's feelings merely are hurt .... Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society.

*Id.* at 293, 637 P.2d at 1179.[12] If defendant's conduct rises to this level, the Court must determine whether the emotional distress suffered by plaintiffs is so severe that no reasonable person should be expected to endure it. If plaintiffs' claim fails either of these threshold requirements, the claim cannot survive. If the Court determines that "reasonable fact finders might differ as to whether defendant's conduct was sufficiently extreme and outrageous as to subject him to liability for emotional distress," and that "plaintiff's emotional distress was such that reasonable fact finders might differ as to whether plaintiff's emotional distress was genuine and so severe and extreme as to result in liability, then and only then, it must be left to the jury to determine liability based on the evidence at trial." *Taiwo v. Vu,* 249 Kan. 585, 590, 822 P.2d 1024, 1027–28 (1991).

■■ In seeking to recover for intentional infliction of emotional distress, plaintiffs rely solely on one remark which plaintiffs heard one time. While the Court does not doubt the power of language, it is satisfied that as a matter of law, Cundiff's language is not actionable under the tort of outrage.[13] The few Kansas cases which

---

**12.** "The extreme and outrageous character of the conduct complained of may arise from the actor's knowledge that the other is particularly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." *Wiehe v. Kukal,* 225 Kan. 478, 481–82, 592 P.2d 860, 863 (1979) (quotations omitted). Here, however, the record contains no evidence that Cundiff knew that Fuller was unusually susceptible to stress or unusually likely to suffer epileptic seizures as a result of stress.

**13.** The following cases demonstrate the types of conduct that may constitute outrageous behavior under Kansas law: *Perry v. Saint Francis Hosp. & Med. Ctr.,* 886 F.Supp. 1551, 1560–62 (D.Kan.1995) (nurse exploited position of trust and intentionally misled grieving family to complete consent forms to donate of tissue from dead body of loved one in violation of family's express wishes); *Bernard v. Doskocil Cos., Inc.,* 861 F.Supp. 1006, 1015 (D.Kan.1994) (racial slurs, pranks and threat to throw flammable rag around plaintiff's neck while he was welding); *Laughinghouse v. Risser,* 754 F.Supp. 836, 843 (D.Kan.1990) (continuous harassment for two years, including screaming and cursing, unwanted touchings and sexual comments and fits of rage because plaintiff would not sleep with defendant); *Taiwo,* 249 Kan. at 593, 822 P.2d 1024 (assault, battery, false imprisonment, false accusations, inducing employee to falsely accuse, and filing of false police reports against plaintiff); and *Gomez v. Hug,* 7 Kan.App.2d 603, 604–05, 645 P.2d 916 (1982) (verbal attack with vulgar racial slurs, grossly offensive insults and repeated threats of physical violence).

have survived summary judgment have involved repeated physical threats and racially or sexually abusive language. *See White v. Midwest Office Tech., Inc.,* 5 F.Supp.2d 936, 953 (D.Kan.1998); *Oliphant v. Perkins Rests. Operating Co.,* 885 F.Supp. 1486, 1489–90 (D.Kan.1995) (claim survived summary judgment when supervisor repeatedly cursed at and threw objects at employee for a year and berated her at home with daily phone calls when she was pregnant and on medical leave); *Miller v. Bircham, Inc.,* 874 F.Supp. 337, 341 (D.Kan.1995) (claim survived summary judgment when supervisor took no action in face of knowledge that employee was subjected to offensive touching by co-employee on numerous occasions).

The Court recognizes that the phrase "eenie, meenie, minie, moe" is burdened by racial connotations and that a person of any race, familiar with its history, could take reasonable offense at hearing it broadcast over the intercom of an airplane. In this case, as noted above, a reasonable jury could find that (1) Cundiff's statement was objectively offensive, regardless of her intent, and (2) depending on plaintiffs' testimony at trial, that plaintiffs themselves took offense. Nonetheless, plaintiffs have not shown that Cundiff's remark was so extreme and outrageous as to be "utterly intolerable in a civilized society." It bears repeating that Cundiff's remark was not expressly racist in nature. Its ability to offend lay exclusively in its history, of which—according to Dr. Winn—recent generations are increasingly unaware. Therefore, while plaintiffs may have been insulted, annoyed and humiliated, and Cundiff's language may have been deliberately unkind, impolitic and insensitive, no reasonable jury would agree that in these circumstances, her language was so outrageous in character and so extreme in degree as to be regarded as atrocious and utterly intolerable in a civilized society.

Even if plaintiffs met the threshold requirement of showing "extreme and outrageous" conduct, they have not established that they suffered emotional distress which was so severe that no reasonable person should be expected to endure it. The Kansas Supreme Court has adopted Restatement (Second) of Torts § 46(1) (1963), and comments j and k to that section are instructive on this issue:

> The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed. * * *

> The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge. * * *

> It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed. * * *

> Normally, severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, which in itself affords evidence that the distress is genuine and severe. The rule stated is not, however, limited to cases where there has been bodily harm; and if the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone, without such harm. In such cases the court may perhaps tend to look for more in the way

of outrage as a guarantee that the claim is genuine; but if the enormity of the outrage carries conviction that there has in fact been severe emotional distress, bodily harm is not required.

*Taiwo*, 249 Kan. at 594–95, 822 P.2d at 1030–31. Kansas does not permit recovery for emotional distress in tort actions unless that emotional distress is accompanied by physical injury. *See Maddy v. Vulcan Materials Co.*, 737 F.Supp. 1528 (D.Kan.1990) (citing *Anderson v. Scheffler*, 242 Kan. 857, 752 P.2d 667 (1988)).

Sawyer and Fuller claim that as a direct result of Cundiff's comment, they suffered humiliation, stress and extreme and severe mental and emotional distress. The record evidence, however, is that Sawyer did not have any physically symptoms; except for the fact that a lawsuit is on file, her life has not been altered in any way. Fuller did provide evidence of emotional distress—she was humiliated, upset, her hands began to shake and she suffered seizures as a result of her stress—but she has provided no evidence that it was "so severe that no reasonable person should be expected to endure it." *Lindemuth v. Goodyear Tire & Rubber Co.*, 19 Kan. App.2d 95, 100, 864 P.2d 744, 749 (1993) (citations omitted). The record also contains no evidence that Cundiff knew that Fuller was unusually susceptible to stress or unusually likely to suffer epileptic seizures as a result of stress. A reasonable jury would not hold Southwest liable for Fuller's atypical response to the events of February 15, 2001, which Cundiff had no reason to anticipate.

The Court sustains Southwest's summary judgment motion as to plaintiffs' claim for intentional infliction of emotional distress.

## C. Negligent Infliction Of Emotional Distress

Fuller testified that she suffered seizures on February 15, 2001 because Southwest refused to let her board Flight 2441, because Cundiff made the "eenie, meenie, minie, moe" remark and did not help her find a seat, and because other passengers snickered at her.[14] Fuller claims that Southwest's conduct amounted to negligent infliction of emotional distress. Southwest argues that it is entitled summary judgment because Fuller's injuries cannot sustain an action for negligent infliction of emotional distress under Kansas law and negligent conduct has not been alleged.

As noted, Kansas law has long prohibited any recovery for negligent infliction of emotional distress which is not accompanied by or does not result in physical injury. *E.g.*, *Humes v. Clinton*, 246 Kan. 590, 598, 792 P.2d 1032, 1038 (1990); *Anspach v. Tomkins Indus., Inc.*, 817 F.Supp. 1499, 1509 (D.Kan.1993); *Payne v. Gen. Motors Corp.*, 731 F.Supp. 1465, 1474 (D.Kan.1990). The purpose of the physical injury rule is to guard against fraudulent or exaggerated claims, *Maddy*, 737 F.Supp. at 1534; it also recognizes that emotional distress is a common experience in life and is usually trivial, *Freeman v. Kan. State Network, Inc.*, 719 F.Supp. 995, 1001 (D.Kan.1989). Thus, generalized physical symptoms of emotional distress are insufficient to support an emotional distress claim. *See Schweitzer–Reschke v. Avnet, Inc.*, 874 F.Supp. 1187, 1196 (D.Kan.1995) (feeling of anxiety, rapid heartbeat and sense of collapsing lungs insufficient); *Maddy*, 737 F.Supp. at 1534, 1537 ("real-keyed up, nervous, anxious-type felling, headaches" insufficient); *Anderson*,

---

**14.** Specifically, Fuller claims that Southwest caused her to have petit mal seizures on board the aircraft and a grand mal seizure at home that evening. Although Fuller suffered seizures after February 15, 2001, she does not claim that Southwest caused them.

242 Kan. 857, 752 P.2d 667 (shock, emotional pain, feelings of guilt, recurring nightmares and depression insufficient); *Hopkins v. State,* 237 Kan. 601, 612–13, 702 P.2d 311 (1985) (insomnia, headaches, weight gain and general physical upset insufficient). Furthermore, plaintiff must show "that the physical injuries complained of were the direct and proximate result of the emotional distress caused by the alleged negligent conduct." *Hoard,* 233 Kan. at 277, 662 P.2d 1214. Recovery is not allowed "when the cause is remote and speculative or when the alleged resulting damages are so conjectural and speculative as to undermine any sound basis for measurement." *Id.* at 277, 662 P.2d 1214.

■ In this case, although Fuller was irritated when Gonzalez did not board her on Flight 2441, she did not feel stress which caused physical symptoms at that time. *Fuller Deposition* at 51. After she heard Cundiff's remark, however, her hands were shaking, she was very upset, she had one or more petit mal seizures and a grand mal seizure, and she was bedridden for two or three days. Such evidence satisfies the physical injury rule. Also, even though Fuller can suffer a seizure virtually anytime, anywhere and without any apparent cause other than the fact that she suffers from epilepsy, Fuller testified that any kind of stress causes her seizures. *See id.* at 38–39, 662 P.2d 1214. Fuller has personal experience on which to base a lay opinion that stress is a triggering event for her seizures. *See* Rule 701, Fed.R.Evid.; *United States v. Morris,* 41 Fed.Appx. 160, 166 (10th Cir.2002) (Rule 701 allows witness to give opinion testimony rationally based on personal perception); *Nazar v. Passell,* 1989 WL 158037, at *4 (D.Kan.1989) (same). For purposes of summary judgment, such testimony creates a genuine issue of material fact whether Southwest's conduct was the direct proximate cause of Fuller's physical injury.

In order to recover for negligent infliction of emotional distress, however, Fuller must also allege and prove that Southwest was negligent. *Tyrrell v. Boeing Co.,* 1994 WL 114841 (D.Kan.1994). She alleges that Gonzalez and Cundiff intentionally discriminated against her and intentionally inflicted emotional distress on her. The Court has carefully reviewed the record and finds no allegations of negligence except with regard to Southwest's hiring and training of flight attendants. These allegations were not included in the pretrial order and plaintiff cannot avoid summary judgment by asserting new allegations. *See Hullman v. Bd. of Trs. of Pratt Cmty. Coll.,* 950 F.2d 665, 668 (10th Cir.1991) (citation omitted) ("[I]ssues not preserved in the pretrial order have been eliminated from the action, and a party who did not preserve an issue may not use it in resisting a motion for summary judgment."); *Eads v. Unified Sch. Dist. No. 289, Franklin County, Kan.,* 184 F.Supp.2d 1122, 1131 (D.Kan.2002) (citations omitted).

The Court sustains Southwest's summary judgment motion as to the negligent infliction of emotional distress on Fuller.

**IT IS THEREFORE ORDERED** that *Defendant Southwest Airlines Co.'s Motion To Exclude The Testimony Of Plaintiffs' Expert Valdenia Winn* (Doc. # 78) filed November 15, 2002, be and hereby is **SUSTAINED in part,** as to paragraphs 5, 6, part of 8 (which states "other racist words, phrases, and caricatures"), part of 10 (which states "and would consider the utterance of the phrase to be racist, reprehensible, and outrageous"), 11 and 13. Southwest's motion is otherwise **OVERRULED.**

**IT IS FURTHER ORDERED** that *Defendant Southwest Airlines Co.'s Motion For Summary Judgment* (Doc. # 79) filed November 15, 2002, be and hereby is **SUSTAINED in part.** Southwest is entitled to

summary judgment on plaintiffs' claims for intentional infliction of emotional distress and negligent infliction of emotional distress. Southwest's motion for summary judgment is **OVERRULED** as to plaintiffs' discrimination claims under 42 U.S.C. § 1981.