**Genaro GARAY and Eva Garay, parents and heirs of Nicholas Garay, deceased, and Ann Case, personal representative and administrator of the estate of Nicholas Garay, Plaintiffs,**

v.

**MISSOURI PACIFIC RAILROAD COMPANY, a corporation, Union Pacific Railroad Company, a corporation, and Trinity Industries, Inc., individually and as successor to Pullman–Standard, Inc., and FMC Corporation, Defendants.**

**No. CIV. A. 96–1127–WEB.**

United States District Court,
D. Kansas.

June 22, 1999.

**1170**

Pedro L. Irigonegaray, Irigonegaray & Associates, Nicolas Garay, Topeka, KS, Robert L. Pottroff, Myers, Pottroff & Ball, Manhattan, KS, Bradley W. Maudlin, Loyd & Maudlin Law Offices, LLC, Garden City, KS for Plaintiffs.

James M. Yeretsky, Gregory F. Maher, Michael J. Smith, Yeretsky & Maher, L.L.C., Kansas City, MO, for defendants Missouri Pacific R. Co., Union Pacific R. Co.

Kenneth L. Weltz, Lathrop & Gage L.C., Overland Park, KS, Brad W. Schacht, Hugh Q. Gottschalk, Todd A. Fredrickson, Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Denver, CO, for defendants Trinity Inc., Pullman.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This matter came before the court on June 21, 1999, for a motions and status hearing. This written memorandum will summarize the oral rulings made by the court at the hearing.

1. *Defendants' Motion in Limine to Exclude Expert Testimony of Plaintiffs' Engineer, John Sevart.* According to the materials submitted, Mr. Sevart is a former tenured professor in the area of mechanical engineering. He holds B.S. and M.S. degrees in mechanical engineering and is working toward a Ph.D. in controls engineering. In his opinion, the subject railcar was defective and should have been equipped with a fixed grate over the top openings of the car, with lanyard attachments points, and with warnings and instructions concerning the hazards associated with using the car.

Defendants argue that the testimony of Mr. Sevart should be excluded pursuant to the Supreme Court's rulings in *Daubert* and *Kumho Tire.* Specifically, defendants contend Mr. Sevart's opinions are not reliable because, they say, he has no expertise in the design of railcars; he is unfamiliar with American Association of Railroad (AAR) standards governing the design of railcars; he is unfamiliar with the governing federal railroad (FRA) regulations; he has never worked for railcar manufacturers or provided consulting services for them; his proposed alternative design for the railcar is merely an "illustrative concept" which he devised without preparing any drawings, without testing, and without consideration of industry and government standards; and he has no idea based on testing what the effect of his proposed warnings would be. Defendants point out that Mr. Sevart has testified in over a thousand cases, and that he has testified in at least 90% of those cases that the product was defective.

FMC relies in particular on the case of *Tokio Marine & Fire v. Grove Manufacturing Co.,* 958 F.2d 1169 (1st Cir.1992), where the court upheld the exclusion of a civil engineer's opinion that a particular crane was defective. In excluding this testimony, the court said that the expert's opinion required a cost-benefit analysis, and that the engineer was not qualified to do this because he had no familiarity with the relevant industry standards or economic considerations of manufacturing a crane. The railroads also cite *Duffee v. Murray Ohio Mfg. Co.,* 879 F.Supp. 1078 (D.Kan.1995), where the court excluded testimony because the expert was not familiar with industry practice and standards.

In response, plaintiffs submit that Mr. Sevart's unfamiliarity with AAR or FRA standards is immaterial because those standards are not relevant to his opinion. Plaintiffs further contend Mr. Sevart based his opinion on general engineering principles, that he relied upon accepted ANSI and SAE standards, and that there is no requirement under *Daubert* that the

witness be an expert in the particular product at issue. With respect to Mr. Sevart's opinions about what warnings should have been given, plaintiffs argue Mr. Sevart took into consideration ANSI standards and empirical research showing the effectiveness of such warnings. As for Mr. Sevart's opinion that the hopper car should have had a grate covering, plaintiffs argue that such devices are common safety measures· in the grain storage and transportation industry. Finally, plaintiffs contend Mr. Sevart's opinion that the car should have had lanyard attachment points is based on published standards in the grain industry.

■ Under Rule 702, an expert may give opinion testimony if it will assist the trier of fact to understand the evidence or to determine a fact in issue. Under *Daubert* and *Kumho Tire,* district courts must ensure that proffered expert testimony is not only relevant, but reliable. *See id.* at 589, 113 S.Ct. 2786. The reliability of an expert's testimony is verified by assessing whether the reasoning or methodology underlying the testimony is valid. Several nondispositive factors should be considered in making this determination, including: whether the expert's theory or technique (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent community. *See id.,* 509 U.S. at 593–94, 113 S.Ct. 2786. In considering these factors, the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. 2786.

In *Jaurequi v. Carter Manufacturing Co.,* 173 F.3d 1076 (8th Cir.1999), the Eighth Circuit addressed a challenge to an engineer who testified that a particular combine was unreasonably dangerous, that it should have been designed differently, and that it should have contained more extensive warnings. The court excluded this testimony as unreliable, finding that‸ the engineer had not attempted to construct, draw, or test the utility of his pro-posed alternative design, that he was unfamiliar with the warnings that were on the product initially, and that he had not tested or demonstrated the effectiveness of his proposed warnings. The court also discussed other decisions where similar testimony had been excluded because the engineers involved had not developed or tested their proposed alternative designs, had not subjected their ideas to peer review, and had not demonstrated that their theories of design were generally accepted in the field.

■ With this background in mind, the court first concludes that Mr. Sevart's testimony that the defendants should have provided a grate covering on the hopper car fails to meet the *Daubert* standards for reliability. There is no evidence that such a device has been developed or tested for a hopper car. Mr. Sevart's affidavit indicates only that he tested "the flow rate of corn through wire mesh" in an apparent effort to show that his design would not interfere with grain flow, but such a test does little to demonstrate the feasibility and utility of a grate design (including a "lockable access gate") as it would be actually used on a hopper railcar. Nor is there any evidence that any manufacturer has used such a device on a hopper car. In suggesting this alternative design, Mr. Se‘vart was apparently unfamiliar with, and therefore did not consider, railroad industry standards or federal regulations governing the manufacture of railcars. Given his lack of familiarity with railcar manufacture, he could not have performed an accurate cost/benefit analysis of such a device. Nor can the utility of such a device be reliably determined from drawings or by hypothesizing about the effect of such a device. The only published industry literature cited by plaintiff to support Mr. Sevart's opinion is a 1916 article describing the use of a grating over a receiving hopper. Plaintiff cites nothing to show that Mr. Sevart's proposed alternative design has been critiqued by other engineers or is generally accepted in the field. In sum,

the court finds that Mr. Sevart's opinion that the railcar should have had a grate covering device must be excluded pursuant to *Daubert.*

■ With respect to Mr. Sevart's opinion that the defendants should have provided warning of the suffocation hazard posed by entering the railcar and the falling hazard from being on top of the car, the court makes a preliminary finding that such testimony meets the *Daubert* standards and should not be excluded. Some of the summary judgment materials cited by plaintiff, which were used by Mr. Sevart in forming his opinion, show that agricultural engineers have recognized for some time the dangers of entrapment and suffocation associated with flowing grain. *See* Exh. 12 Attached to Plaintiff's Response to Summary Judgment. In particular, they have recognized the latent hazards associated with unloading "gravity-type" grain transport vehicles. For example, one study cited by plaintiff recognized the need for extensive warning decals or labeling on grain transport vehicles as a measure to prevent entrapments. Thus, Mr. Sevart's opinion has support in industry or peer-reviewed literature. Plaintiffs have also shown that Mr. Sevart considered and based the form and content of his proposed warnings signs on industry-accepted standards for warning signs. Under these circumstances, the court concludes that Mr. Sevart's opinions as to the warnings that should have been provided are admissible.

■ The court also finds Mr. Sevart's opinion that the railcar should have had lanyard attachment points is admissible. The same materials mentioned above show that agricultural engineers have long recognized the use of safety lines as a measure to avoid becoming entrapped in grain. Given that the attachments points which Mr. Sevart says should have been provided would merely consist of inserting some eye-bolts on the car, which appears to have been clearly feasible, the court cannot say that a failure to test such a design or the lack of peer-review renders the opinion unreliable under *Daubert.*

2. *Defendants' Motions in Limine to Exclude Expert Testimony Regarding Damages.* Defendants next argue that the opinion of plaintiffs' economic expert, Dr. Gary Baker, should be excluded because it fails to meet the standards of *Daubert* and is speculative. In particular, defendants object to Dr. Baker's opinion as to future lost wages because he did not take into account the fact that the decedent was in this country illegally, he did not consider the possibility that the decedent would have left the United States (voluntarily or involuntarily), and he did not consider the temporary nature of decedent's employment at Bean Acres. Instead, he assumed that decedent would have been continuously employed for the next 40 years in the United States at the wages he was earning at Bean Acres.

Defendants also object to Dr. Baker's calculation of a total loss of $299,994 for the "counseling or nurturing services" the decedent would have provided his parents. They argue this testimony should be excluded under *Cochrane v. Schneider,* 980 F.Supp. 374 (D.Kan.1997), because Dr. Baker did not take into account how much actual time the decedent would have spent providing these services, nor did he factor in the decedent's limited education or the amount of time devoted to his parents (who can recover on the wrongful death claim) as opposed to his siblings (who cannot recover). Finally, the defendants argue that any future estimated losses must be limited to the life expectancies of the decedent's parents.

In response, plaintiffs first argue that the possibility of the decedent's deportation is speculative and does not preclude an award for lost future wages. Plaintiffs argue that the decedent's status is a fact question for the jury to weigh in determining the amount of lost wages. Plaintiffs also point out that several courts have bifurcated the issue of damages so the question of the plaintiff's immigration sta-

tus does not prejudice the jury. Finally, plaintiffs argue that, regardless of the decedent's actual work history, it is fair to assume he would have earned minimum wage. As for limiting loss calculations to the life expectancies of decedent's parents, plaintiffs agree that the damages must be so limited, and further agreed that the limitation should be based on the single life expectancy of one of the parents (whichever is longer) rather than their combined life expectancies.

Lastly, plaintiffs agree that the *Cochrane* case sets forth the correct method of determining the value of lost counseling services and state that Dr. Baker "will confine his testimony to that decision." Plaintiffs state that Dr. Baker can testify as to an hourly value of the services, that he and other witnesses can testify to the actual amount of time spent on such services, and the jury can then determine an appropriate total value of lost services.

The court finds that the defendants' motions to exclude portions of Dr. Baker's testimony should be granted in part and denied in part.

■ The court concludes that the failure of Dr. Baker to take into account the decedent's illegal status in the United States renders his opinion as to future lost wages wholly unreliable. Clearly, the decedent's immigration status could have potentially precluded altogether any future employment opportunities in this country (and would have made any such employment unlawful). Dr. Baker did not take that fact into account, however. He also testified that he was unfamiliar with wages in Mexico. He appears to have given no weight to the fact that the decedent was a temporary worker at the time of his death, and apparently did not consider the decedent's actual employment history in Mexico. In sum, a projection of future wages that wholly fails to take into account such critical factors as are shown by the evidence in the case is speculative and unreliable, and must be excluded.

■ Secondly, the court agrees with defendants that Dr. Baker's projection that plaintiff sustained a loss of approximately $300,000 for lost counseling or nurturing services must be excluded. No showing has been made that this estimate was based upon an estimate of actual time that would have been spent by the decedent in such services. To be reliable, an economic projection must take into account the particular facts of the case. Also, because recovery for wrongful death is limited to the decedent's parents, any projection would have to be limited to the parents' life expectancy and must exclude the value of services provided to siblings.

■ At the same time, the court will permit plaintiffs to offer Dr. Baker's expert opinion as to the unit value of lost counseling and nurturing services, and, assuming plaintiff produces evidence of the nature and extent of such losses, will permit the jury to determine such damages. Under Kansas law the plaintiffs meet their burden of proof on this issue through a showing of the nature and extent of the loss, and the jury is then entitled to make their own determination of damages even in the absence of proof of the value of the services lost. *See Wentling v. Medical Anesthesia Services,* 237 Kan. 503, 701 P.2d 939 (1985).

The defendants are entitled to know before trial, however, what the plaintiff is claiming in the way of damages and the basis for those claims. Plaintiff should inform the defendants of the extent of their claim for lost counseling services in view of the limitations mentioned above.

In view of court's ruling with respect to lost future wages, the plaintiffs announced at the June 21 hearing that they were withdrawing their claim for lost wages. The court thereupon determined that the decedent's immigration status was no longer relevant to any of the remaining issues in the trial.

3. *Plaintiffs' Motion to Bifurcate the Trial and defendants' objection thereto.* Plaintiffs moved to bifurcate the liability and damages phases of trial to avoid any

prejudice stemming from the decedent's immigration status. In view of the rulings above, however, this motion is now moot.

4. *Plaintiffs' Motion in Limine* seeks to exclude evidence of the following:

(1). *Evidence from experts defining the defendants' legal duties.* The court will deny at this time plaintiffs' request to exclude testimony concerning the defendant's legal duties. Although the defendants' compliance with regulatory standards does not provide a defense in this case, nor does it create a presumption that the product was not defective, such testimony may be relevant to other issues, such as the degree of care exercised by the defendants and the feasibility of design alternatives.

■ (2). *Statistical evidence based on dissimilar circumstances.* Plaintiff seeks to exclude statistical evidence from the defendants relating to unloading of hopper cars because defendants have not shown similarity to the incident in this case. The court will deny the motion to exclude this evidence. Statistical evidence of the safety of the product as it is ordinarily used (regardless of whether such use is identical to the facts of this case) is clearly relevant for several purposes, including to show that the product is not unreasonably dangerous and that the product's design or lack of warnings was not the cause of the decedent's death.

(3). Plaintiff seeks to exclude *Evidence of the Decedent's Immigration Status.* This motion is granted for the reasons set forth above.

(4). Plaintiff next seeks to exclude *Evidence of when plaintiffs retained counsel.* The court agrees that such evidence is not relevant and should be excluded.

(5). Plaintiff next seeks to exclude *Deposition testimony of witnesses whose depositions were not properly translated.* The court will deny this motion. Whether any deposition testimony was inaccurate or resulted from a misunderstanding is a question of fact for the jury to determine. To the extent it becomes relevant, plaintiffs can present evidence to the jury to explain any challenged deposition testimony.

■ 5. *Plaintiff's Motion for Determination Regarding Out-of-State Witnesses, Plaintiff's Notice of Depositions; and Defendant FMC's Motion to Quash Depositions.* In view of counsels' agreement that the foundation for the railroads' rules could be stipulated to, the defendants' motion to quash these depositions is granted pursuant to agreement of the parties.

6. Next is *Plaintiff's Notice of Intent to Request Judicial Notice,* which concerns plaintiff's intent to offer excerpts from various authorities and documents. The parties agreed that they could stipulate as to the authenticity of these documents. The motion is therefore moot.

7. The last motion is *Defendant Railroad's Motion in Limine to Preclude Introduction of Exhibits Not timely Disclosed by Plaintiffs.* Defendants state that they received an exhibit list from the plaintiffs on June 15, 1999, which contains 58 exhibits that were not listed in the Pretrial Order. They argue this contravenes the Pretrial Order, which said that except by consent of the parties or by order of the court, exhibits not listed in the Pretrial Order shall not be admitted into evidence.

The court finds that the motion should be denied. The defendants received most, if not all, of these documents in discovery, and the court finds no unfair surprise from including them on the exhibit list. The court will address the admissibility of the documents if, as, and when they are offered.

*Conclusion.*

Defendants' Motions In Limine to Exclude Expert Testimony of John Sevart (Docs. 117 & 120), Defendants' Motion in Limine to Exclude Expert Testimony Concerning Damages (Doc. 118), and Plaintiffs' Motion in Limine (Docs. 130 & 143), are GRANTED IN PART and DENIED IN PART as set forth above; Defendants' Motion to Quash Depositions (Docs. 145 & 151) is GRANTED as set forth above; and

Defendants' Motion in Limine to Exclude Exhibits (Doc. 149) is DENIED as set forth above. IT IS SO ORDERED this 22nd day of June, 1999, at Wichita, Ks.