**Ralph E. ACKER, Wilma J. Acker, and Everseal Gasket, Inc., Plaintiffs,**

v.

**BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, Defendant.**

**No. 00–2487–GTV.**

United States District Court, D. Kansas.

Dec. 3, 2004.

Steven R. McConnell, James F. McMahon, McConnell & McMahon, Lenexa, KS, for Plaintiff.

K. Paul Day, Patrick N. Fanning, Lathrop & Gage L.C., Todd E. Hilton, Stueve Helder Siegel LLP, Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

Plaintiffs Ralph E. and Wilma J. Acker and Everseal Gasket, Inc. bring this negligence action alleging that Defendant Burlington Northern and Santa Fe Railway Co. caused flooding to their gasket manufacturing plant when Defendant left several cars of one of its trains on the tracks adjacent to a watercourse during a torrential rainstorm. According to Plaintiffs, Defendant's actions resulted in a dam effect, backing up water into their plant. Plaintiffs claim that because of Defendant's actions, they incurred hard damages, lost profits, and ultimately had to relocate the plant.

Three motions are before the court: Defendant's motion to exclude the expert testimony of Charles Morris (Doc. 152); Defendant's motion to exclude the expert testimony of Plaintiff Everseal's damages experts, Donald Towle and Robert Metcalf (Doc. 150); and Defendant's motion for partial summary judgment on the issue of damages (Doc. 146).

The court heard oral argument on the motions, and is now prepared to rule. The court denies Defendant's motion to exclude the testimony of Charles Morris (Doc. 152). The court grants in part and denies in part the motion to exclude the testimony of the damages experts (Doc. 150); Donald Towle may testify at trial, but Robert Metcalf may not. And the court denies as moot the motion for partial summary judgment on the issue of damages (Doc. 146).

## I. FACTUAL BACKGROUND

Although the facts are largely irrelevant to deciding the instant motions, the court

offers the following general statement of the case in order to provide background to its rulings. The facts are taken from the summary judgment record, and are either uncontroverted or viewed in the light most favorable to Plaintiffs.

On the night of October 4, 1998, approximately five inches of rain fell in the Kansas City metro area in one hour. At approximately 7:40 that night, one of Defendant's trains left the 19th Street yard in Kansas City, Missouri, bound for Fort Scott, Kansas. Plaintiffs have presented evidence that the train crew realized the risk of the tracks washing out ahead, but left the yard anyway. Although the crew encountered water over the tracks at one point, they continued. The crew was also allowed to proceed through a stop signal, and Plaintiffs claim they should not have been allowed to proceed past the signal.

As the train traveled over tracks located adjacent to Turkey Creek, flood waters from the creek began accumulating and rising around the tracks at a rapid rate. As a result of the water surrounding it, the train was forced into emergency brake application near Milepost 4.4. Once stopped, the train could not be moved until the problem causing the emergency brake application was fixed. The crew uncoupled the locomotives and the railcars that were not already partially submerged, and moved that part of the train to higher ground.

The Everseal plant was located near the railroad tracks. Plaintiffs Everseal and Ralph and Wilma Acker claim that the stranded railcars created a dam effect—causing flood waters to back up and then concentrate in increased depth and volume, flooding Everseal's plant.

The Ackers owned the land and building from which Everseal operated, and Everseal paid the Ackers a monthly rent. After the flood, the Ackers shut down Everseal for two weeks while they cleaned up the facility. They made many of the repairs themselves, but stopped before fully repairing the building. They purchased a new property, built a new facility for Everseal, and sold the old property in May 2000. Everseal then began renting the new facility from the Ackers. Everseal did not go out of business.

## II. STANDARD OF REVIEW

The court only recounts the standard for ruling on the motions to exclude expert testimony, as the court's rulings on those motions alleviate the need to rule on Defendant's motion for partial summary judgment.

■ Rule 702 of the Federal Rules of Evidence governs whether expert testimony is admissible. When evaluating testimony under Rule 702, the court serves a "gatekeeping" function, which "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 142, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The gate-keeping function applies to all expert testimony, *id.* at 150–51, 119 S.Ct. 1167, including testimony based on economic analysis, *see, e.g., Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1164 (10th Cir. 2000); *Garay v. Mo. Pac. R.R. Co.,* 60 F.Supp.2d 1168, 1173 (D.Kan.1999); *Cochrane v. Schneider Nat'l Carriers, Inc.,* 980 F.Supp. 374, 376–80 (D.Kan.1997). The court has broad discretion in deciding whether to admit expert testimony, *Kieffer v. Weston Land, Inc.,* 90 F.3d 1496, 1499 (10th Cir.1996), but it must determine whether the testimony will be both relevant and reliable, *Kumho Tire Co.,* 526 U.S. at 141, 119 S.Ct. 1167 (citing *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579,

597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

To evaluate relevancy, the court must consider whether the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R.Evid. 702. The court should evaluate whether the testimony is " 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (citation omitted). To evaluate reliability, the court should utilize the flexible *Daubert* test of reliability, which includes the following factors: "(1) whether the proffered technique can and has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a technique in the relevant community." *Sawyer v. Southwest Airlines Co.*, 243 F.Supp.2d 1257, 1266 (D.Kan.2003) (citing *Kumho Tire Co.*, 526 U.S. at 149, 119 S.Ct. 1167). An expert's qualifications are relevant to the reliability inquiry. *Id.* (citations omitted).

### III. DISCUSSION

#### A. Motion to Exclude the Testimony of Charles Morris

Charles Morris proposes to testify regarding the extent of the flooding on October 4, 1998 and as to the portion of the flooding on Plaintiffs' property attributable to the actions of Defendant. Dr. Morris is an engineer who has been running a consulting/expert witness business for twenty-five years. He has designed a hydrologic model to predict the height of flood waters in the absence of Defendant's train and with the train present.

Dr. Morris offers three opinions:

(1) The majority of the flooding experienced at the Everseal Plant was due to the rail cars being left on the railroad tracks near the plant.

(2) The railroad embankment and bridge also contributed to the flooding problems at the Everseal Plant.

(3) The hydrologic models used to arrive at these opinions successfully predicted the flood elevations of April 10, 1993, thus validating the models used to predict the October 4, 1998 flood event at the Everseal Plant.

Defendant objects to Dr. Morris's testimony on several grounds. Defendant first contends that Dr. Morris's model does not rest on reliable assumptions. According to Defendant, Dr. Morris's testimony is inadmissable because it is based on a model proven inaccurate with respect to actual surveyed 1998 flood depths. Defendant's expert surveyed the high water mark of flood waters on Plaintiffs' building, and it was an elevation of 805.3 feet. Dr. Morris's model opines that the high water mark was 812 feet.

Plaintiffs respond that the surveyed marks give a misleading impression of how high the water was because they are at the back of the building and on the opposite side of the railroad tracks, where the creek bed is fifteen feet lower than the factory. They argue that "silt" water marks used by Defendant's expert do not identify the highest point of water, and the water was actually above those marks. Moreover, at least forty witnesses attest to the fact that Everseal had over seven feet of water inside the factory.

■ On this point, the court agrees with Plaintiffs. Defendant discusses the evidence of surveyed flood depths as if it is unchallenged. But the survey was done by Defendant's own expert. The court will not rule as a matter of law that Defendant's expert's method of measurement is more reliable than Dr. Morris's method. Dr. Morris has sufficiently explained in his

deposition the validity of his method, and has offered in an affidavit reasons that his calculation is actually more accurate than Defendant's measurement.[1] The court sees no basis for striking Dr. Morris's testimony on the basis of reliability.

Defendant next argues that Dr. Morris's technique is not generally accepted within the relevant community. Defendant contends that an adequate hydrologic model is calibrated to the high water marks of the specific relevant flood, but Dr. Morris calibrated his to a flood that occurred in 1993. Plaintiffs respond that the actual flood elevations for 1993 are known, but they are not known for 1998, so it makes more sense to calibrate the model to known elevations. The court agrees. Defendant's own expert stated in deposition that Dr. Morris used an appropriate methodology to model the waterflow in the area. Defendant has not provided evidence suggesting that a hydrologic model cannot be verified by using the results of one flood to prove the accuracy of the measurements of another. The fact that Dr. Morris verified his results at all speaks favorably on the reliability of his testimony, as does the fact that he used a slightly modified version of a model approved by the Army Corps of Engineers. *See Sawyer*, 243 F.Supp.2d at 1266 (citing *Kumho Tire Co.*, 526 U.S. at 149, 119 S.Ct. 1167).

Defendant also argues that Dr. Morris's assumption that debris blocked eighty percent of the space beneath the railcars is not generally accepted or scientifically valid. Defendant contends that because Dr. Morris based his conclusion that eighty percent of the space beneath the railcars was blocked on a photo taken *after* the flood, the number inaccurately reflects blockage *during* the flood.

Defendant may make this argument before the jury. The record before the court contains no evidence suggesting that blockage would be different during and after the flood. The court will not reject Dr. Morris's opinion based on Defendant's unsupported assumption.

Defendant's last argument attacks the relevancy of Dr. Morris's opinion that the embankment and bridge also contributed to the flooding. Plaintiffs previously sought to amend their complaint in this case to add claims against Defendant involving the embankment and bridge, and Magistrate Judge Waxse ruled that they were barred by the statute of limitations. Plaintiffs respond that it would be impossible to model the effect of the train without also considering the bridge and embankment. Again, the court agrees. Plaintiffs do not appear to be attempting to reinstate their claims with this evidence; they are merely using it to accurately model the effect of the train.

For the above-stated reasons, the court determines that Dr. Morris meets the requirements of *Daubert* and *Kumho Tire Co.* He will be allowed to testify as an expert witness at trial.

### B. Motion to Exclude the Testimony of Damages Experts

Defendant next claims that the testimony of Plaintiff Everseal's damages experts, Donald Towle and Robert Metcalf, is inadmissible under Rule 702. Mr. Towle and Mr. Metcalf, both CPAs, seek to testify regarding the amount of money Plaintiff Everseal lost as a result of the flooding.

---

1. Defendant asks the court to disregard the affidavit submitted by Dr. Morris attacking the survey method used by Defendant's expert. Defendant claims that Plaintiffs failed to identify Dr. Morris as a rebuttal expert by the court's deadline for doing so. The court will not disregard Dr. Morris's rebuttal. Dr. Morris is not a new expert or someone Defendant has not had an opportunity to depose.

The nature of Mr. Towle's proposed testimony is fairly straightforward: He intends to testify as to the actual damages incurred by Plaintiff Everseal, including lost profits, sustained from October 4, 1998 through December 31, 2001.[2] Mr. Towle calculated that the total damage for this period is $3.2 million.

The court is less clear on the proposed content of Mr. Metcalf's testimony. Originally, Mr. Metcalf characterized his proposed testimony as covering the "lost business value" of Plaintiff Everseal, amounting to $5.1 million. Based on this characterization, Defendant argued that damages for lost business value are not recoverable when the business is still functioning.

In an affidavit submitted with Plaintiff Everseal's response to Defendant's motion, Mr. Metcalf says that he actually proposes to testify as to the value of the future lost profits. His calculations do not include flood repair, clean-up, or replacement costs, nor do they include any lost profits for October 4, 1998 through December 31, 2001. He explained that he referred to the post-December 31, 2001 effect of the flood as an analysis of "lost business value" to maintain a distinction between empirically observed net profit data and net profit data produced by simulation.

Defendant argues that the experts' testimony is unreliable, irrelevant, and not based on generally accepted techniques.[3] In support of its unreliability argument, Defendant points out that the experts used December 31, 2001—more than 31 months after the flood—as the key date for their financial projections. Between the flood and that date, the United States economy sustained a significant economic downturn, a change in leadership, and the 9/11 attacks. Also, Plaintiff Everseal proposes to string out its loss projections for seventy-seven years, which Defendant claims is excessive. Section 303.39 of the *Guide to Litigation Support Services*, a practice manual cited by Plaintiffs and attached by Defendant to its briefs, counsels that it is difficult to proximately link lost profits to an event over three years in the past. *Guide to Litig. Support Servs.* § 303.39 (8th ed. Practitioners Publishing Co.2003).

Moreover, Defendant argues, if Mr. Metcalf, in arriving at his $5.1 million number, was truly calculating lost profits, then he is not qualified to do so. In his deposition, he said that the $5.1 million number was the "value of the loss of the asset only as of that particular date.... The lost profits would be Don Towle's forte and his department.... He has expertise and has done lost profit analysis in the past. I have not. I have done valuations and I'm the person in our CPA firm who does most, if not all, of the valuations, and, therefore, that's my expertise and that's the area I worked on."

Defendant also argues that Mr. Towle's opinions take into account, and do not distinguish, Plaintiff Everseal's repair, replacement, and clean-up costs, even though Plaintiff Everseal's president also testifies that these amounts totaled $2.2 million. And Defendant objects to Mr. Towle's analysis on the basis that he has not calculated lost profits to a reasonable certainty, largely because Mr. Towle relied on Plain-

---

**2.** At the time the experts were retained, Plaintiff Everseal had financial records complete through December 31, 2001.

**3.** Some of the arguments explained below are found in Defendant's motion for partial summary judgment. Because they are also applicable in the context of the motion to exclude expert testimony, the court will address them here.

tiff Everseal's president's statement that he knew of three customers the company had lost because of the flood. Defendant claims that the statement is anecdotal, and insufficient to support a conclusion that Plaintiff Everseal lost millions in profits as a result of the flood.

Plaintiff Everseal responds that its experts took all of the relevant factors except a change in national leadership into account and adjusted for them. It also argues that its experts based their methods on accepted accounting principles and the *Guide to Litigation Support Services*. And it argues that the use of December 31, 2001 actually enhances the accuracy of the valuation because the experts were able to use hard data instead of projected data. Plaintiff Everseal also notes that although Mr. Metcalf projects losses over seventy-seven years, such a projection is reasonable because the losses will be negligible near the end.

■ The court concludes that the testimony of Mr. Towle meets the *Daubert* reliability standard, but the testimony of Mr. Metcalf does not. Although Mr. Towle does not distinguish hard expenses from lost profits, the court fails to see how this makes his testimony unreliable. Defendant may point out at trial that Mr. Towle's figures encompass the $2.2 million in hard damages that Plaintiff Everseal's president claims the company incurred. The court is also not convinced that the use of December 31, 2001 as the "key date" for calculations compromises the integrity of Mr. Towle's figures. To the contrary, because Plaintiff Everseal had financial information available through that date, Mr. Towle's figures are arguably more accurate. Although the country experienced several changes in national landscape between 1998 and 2001, the court is satisfied that Mr. Towle considered these changes in his analysis. Mr. Towle was also justified in relying on Everseal's president's representation that the company had lost three clients. Mr. Towle testified in deposition that he utilized the company's ten-year growth rate history and trends and expectations in calculating how much Everseal should have expected to grow in the absence of the flood. The evidence that Everseal actually lost customers as a result of the flood was merely supportive of Mr. Towle's figures; it did not drive the figures.

■ Mr. Metcalf's proposed testimony, however, does not meet the *Daubert* reliability standard. As noted above, the characterization of Mr. Metcalf's testimony has changed over time. It now appears that Mr. Metcalf intends to testify regarding projected lost profits, an area in which Mr. Metcalf himself admits he is not qualified as an expert. And those lost profits are strung out over seventy-seven years, a period of time the court finds exceedingly long to relate back to a single flood. His testimony is too speculative and the connection to the flood too attenuated. *See Vickers v. Wichita State Univ.*, 213 Kan. 614, 518 P.2d 512, 517 (1974) ("It is the responsibility of a district court to see that speculative and problematical evidence does not reach the jury.") (citation omitted).

Defendant next contends that the testimony of the damage experts is irrelevant. Defendant claims that businesses may recover under only one measure of damages, and the experts do not distinguish between measures and/or combine measures. They cannot seek both lost profits and lost business value. The court agrees. *See Gustafson v. Gen. Motors Acceptance Corp.*, 470 F.2d 1057, 1061 (8th Cir.1973) ("An injured seller of a business may not be compensated for the difference between the fair market value of his business and the amount actually received and then also

be compensated for the loss of income he would have received from the business in the future."). Plaintiff Everseal appears to have conceded this argument by clarifying that Mr. Metcalf intends to testify as to lost profits.

Finally, Defendant claims that the testimony is subject to a high error rate and is not based on generally accepted techniques. Defendant argues that the experts projected revenues and sales that have no connection with Plaintiff Everseal's actual sales history, and used an extremely low discount factor of five percent. They failed to use insurance industry claim adjustment procedures to calculate damages, which Defendant argues are the relevant guidelines for estimating damages as a result of a flood. Plaintiff Everseal responds simply that its error rate is not high.

Because the court has already ruled that Mr. Metcalf may not testify, these arguments need only be considered with respect to Mr. Towle. Mr. Towle explained in his deposition why he used an average long-term growth rate to project revenues and sales, even though sales and gross margins had been declining in 1996 and 1997. Mr. Towle attributed the declines to a concentrated effort by Everseal to get rid of lower-margin customers, and assumed that the growth rate would return to its long-term average once that initiative was accomplished. He explained that the discount rate took into account outside economic factors. Moreover, although Defendant argues that the insurance industry claim adjustment procedures should have been used, Defendant offers no support for the assertion. The court is satisfied that Mr. Towle's techniques are based on generally accepted techniques and that the error rate is not too high.

### C. Motion for Partial Summary Judgment on Damage Claims

Defendant's motion for partial summary judgment is rendered moot by the court's rulings on Plaintiff Everseal's damage experts. In its motion for summary judgment, Defendant primarily argued that Plaintiff Everseal was not allowed to recover two measures of damages, lost profits and lost business value. Because the court has ruled that Mr. Metcalf cannot testify as to Everseal's lost business value (or future lost profits), Defendant's motion for partial summary judgment is denied as moot.

IT IS, THEREFORE, BY THE COURT ORDERED that Defendant's motion to exclude the testimony of Charles Morris (Doc. 152) is denied.

IT IS FURTHER ORDERED that the motion to exclude the expert testimony of the damages experts (Doc. 150) is granted in part and denied in part; Donald Towle may testify at trial, but Robert Metcalf may not.

IT IS FURTHER ORDERED THAT the motion for partial summary judgment on the issue of damages (Doc. 146) is denied as moot.

Copies or notice of this order shall be transmitted to counsel of record.

**IT IS SO ORDERED.**